**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

|  |  |
|---|---|
| ALICE SULLIVAN, | CASE NO. 1:25-CV-00557 |
| Plaintiff, |  |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY, | **MEMORANDUM OPINION AND ORDER** |
| Defendant. |  |

Plaintiff Alice Sullivan seeks judicial review of the final decision of Defendant Commissioner of Social Security denying her application for Social Security Disability Benefits. (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter is before the undersigned by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  (ECF Doc. 8.)  For the reasons set forth below, the Court **VACATES** and **REMANDS** the case pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this Order. On remand, the ALJ should provide a clear, accurate, and well-reasoned explanation to support her findings regarding the persuasiveness of all medical opinion evidence, including the medical opinions of treating provider Jonathan Sharpe, DPM, and ensure that her stated rationale builds an accurate and logical bridge between the evidence and the result.

## I.     Procedural History

In October 2019, Ms. Sullivan filed applications for Disability Insurance Benefits, Disabled Widow Benefits, and Supplemental Security Income, alleging a disability onset date of August 6, 2018, which was later amended to September 8, 2019.  (Tr. 17, 247, 254-68, 280.)

1

She alleged disability due to hypothyroidism, left foot pain, hernia, and double knee replacement.  (Tr. 79, 106, 133, 155.)  Ms. Sullivan's applications were denied at the initial level and upon reconsideration, and she requested a hearing.  (Tr. 17.)  She has received two unfavorable decisions relating to her applications.  (Tr. 14-35, 990-1012.)

The first unfavorable decision was issued on May 4, 2021 (Tr. 14-35) and was reversed and remanded by the District Court for further proceedings on March 15, 2023.  (Tr. 1121-22.)  The District Court found the ALJ erred in her evaluation of RSDS/CRPS evidence and Plaintiff's subjective statements regarding the intensity, persistence, and limiting effects of her pain, and also found the ALJ's evaluation of the medical opinion of Jonathan Sharpe was not supported by substantial evidence.  (Tr. 1109-19.)  The Appeals Council then remanded the matter on August 4, 2023, for further proceedings consistent with the District Court's order.  (Tr. 1123-26.)

Following the Appeals Council's remand (Tr. 1123-26) and hearing on January 30, 2024 (Tr. 1013-55), the ALJ issued a second unfavorable decision on April 16, 2024 (Tr. 990-1012).  The ALJ found Ms. Sullivan not disabled from September 8, 2019, through the date of the decision.  (Tr. 990-1012.)  The Appeals Council considered Plaintiff's written exceptions to the ALJ's decision.  (Tr. 973-87.)  It found no reason to assume jurisdiction, making the ALJ's April 16, 2024 decision the final decision of the Commissioner.  (Tr. 973-78.)   On March 21, 2025, Ms. Sullivan filed a Complaint challenging the Commissioner's final decision denying her social security disability benefits.  (ECF Doc. 1.)  The matter is fully briefed.  (ECF Docs. 9, 12, & 13.)

## II.     Evidence

### A.     Personal, Educational, and Vocational Evidence

Ms. Sullivan was born in 1961 and was of "advanced age" under social security regulations at the alleged onset date.  (Tr. 247.)  At the time of the 2024 hearing, she was living

with her daughters (twenty-five and eleven-years-old) and great niece (eleven-years-old).  (Tr. 1019-20, 1021-22, 1034-35.)  Ms. Sullivan completed school through the eleventh grade and did not obtain her GED.  (Tr. 287, 1020.)  She had past work as a garment worker, warehouse worker, and retail store manager.  (Tr. 46-58, 1004, 1024-29.)  She last worked on September 8, 2019. (Tr. 42, 46, 286.)

**B.  Medical Evidence**

The Court has reviewed and considered the evidence set forth in the parties' briefs and the ALJ's decision (ECF Doc. 9, pp. 6-16; ECF Doc. 12, pp. 1-5; Tr. 996-1004) and summarizes relevant evidence below.

### 1.  Relevant Treatment History

Ms. Sullivan had her right knee replaced in 2013 (Tr. 342) and her left knee replaced in February 2018 (Tr. 339).  At subsequent physical therapy appointments in 2018, Ms. Sullivan reported ongoing problems with her left knee, including pain, stiffness, fatigue, and difficulty bending her knees.  (Tr. 360, 362, 374, 376, 378.)

In August 2018, Ms. Sullivan presented to Jonathan Sharpe, DPM, at Orthopedic Associates of Lake County, complaining of left foot pain.  (Tr. 703.)  She reported severe and throbbing left foot pain since her February knee replacement.  (*Id*.)  An x-ray of her foot showed periosteal reaction lateral diaphysis of the 4th metatarsal.  (Tr. 704.)  Dr. Sharpe diagnosed a closed nondisplaced fracture of the 4th metatarsal bone of the left foot and prescribed a pneumatic walking boot.  (Tr. 703.)  Ms. Sullivan continued to report ongoing left foot pain during a follow up visit with Dr. Sharpe in September 2018.  (Tr. 701.)  Her examination revealed: no hypersensitivity, numbness, drop foot, paralysis, or allodynia; musculoskeletal pain with motion to the 4th and 5th rays; focal severe pain near the mid to base of the 4th metatarsal

3

and base 2nd metatarsal; no detectable Lisfranc instability; "very painful" forced eversion and dorsiflexion of the tarsometatarsal joints; and intact extensors without pain on testing.  (*Id.*)  X-rays showed "solid periosteal reaction lateral diaphysis of the 4th metatarsal" with "possible geographic lesion base medial 2nd metatarsal with erosive appearance to the medial cortex and narrowing and sclerosis of the medullary canal."  (Tr. 702.)  Dr. Sharpe ordered an MRI for further evaluation due to prolonged symptoms that had not improved with immobilization.  (*Id.*)

A September 19, 2018 left foot MRI showed "[s]esamoiditis of the tibular and fibular sesamoid bones at the first MTP joint with equivocal longitudinally oriented fracture through the distal margin in the tibial sesamoid bone" and "[m]ild stress reaction in the dorsal margin lateral cuboid bone and lateral cuneiform bone."  (Tr. 656-57.)

Throughout 2018 and into 2019, Ms. Sullivan continued to treat with Dr. Sharpe, reporting left foot pain despite attempts at immobilization.  (Tr. 683, 687, 689, 692, 696, 698.)  Additional testing included a three-phase bone scan in November 2018 (Tr. 654-55) and CT scan in May 2019 (Tr. 652-53).  The bone scan showed "[a]symmetric flow with greater activity on the right as compared to the left" and "[f]ocal moderate increased activity within the left mid foot at the second tarsometatarsal articulation as well as at the level of the third cuneiform and/or possibly the cuboid of the left foot."  (Tr. 654-55.)  The CT scan showed left chronic plantar fasciitis.  (Tr. 652-53.)

During an August 26, 2019 visit with Dr. Sharpe, Ms. Sullivan reported that her pain was not improving; wearing a night splint as Dr. Sharpe had recommended did not help.  (Tr. 683.)  She rated her pain at "15/10" and said her foot felt like it was on fire, with pain across her toes and lateral foot which radiated up her leg.  (*Id.*)  Her examination showed: tenderness to palpation at the left plantar fascia enthesis and diffusely across the left fifth metatarsal; pain on

active resistance of left forefoot eversion; and tenderness to palpation at the peroneus brevis just distal to the lateral malleolus to its enthesis.  (*Id*.)  There was no left foot/ankle skin mottling, sudomotor changes, or allodynia.  (*Id*.)  Dr. Sharpe diagnosed plantar fasciitis, primary osteoarthritis, pain in the left foot, and other chronic pain.  (*Id*.)  The following month, Dr. Sharpe performed an endoscopic plantar fasciotomy of the left foot.  (Tr. 399.)

Ms. Sullivan continued to report left foot pain after surgery during visits with Dr. Sharpe on September 23 and October 21, 2019.  (Tr. 677, 679.)  At times, her pain was controlled with ibuprofen and Tylenol.  (*Id*.)  In October 2019, she reported no pain when at rest but continued pain with weightbearing activity.  (Tr. 677.)  She declined a cortisone injection.  (*Id*.)  Since she continued to have chronic foot pain, and MRI and x-rays had been negative, Dr. Sharpe recommended a bone scan to determine whether there were any fractures (*Id*.)  Ms. Sullivan's October 25, 2019 three-phase bone scan showed increased radiotracer uptake in the left foot and ankle in all 3 phases.  (Tr. 673-74.)  On the delayed phase, it showed diffusely increased uptake in the left ankle joints and great toe, and calcaneus.  (*Id*.)  It was noted that the findings could indicate complex regional pain syndrome ("CRPS") / reflex sympathetic dystrophy ("RSD"). (*Id*.)  It was also noted that the asymptomatic right foot displayed increased radiotracer uptake in the right ankle and great toes metatarsophalangeal joint in a similar pattern, which could also indicate underlying RSD.  (*Id*.)

On October 28, 2019, Ms. Sullivan met with Dr. Sharpe to review the bone scan results. (Tr. 673.)  Dr. Sharpe noted that Ms. Sullivan had "failed extensive conservative care including boots, casts, physical therapy, [and] various medications."  (Tr. 675.)  He further noted that: Ms. Sullivan had endoscopic plantar fasciotomy on the left and continued to have "persistent moderate to severe pain to the dorsal foot"; and although she "seem[ed] a little atypical for CRPS

5

or RSD," it was "certainly . . . not out of the realm of possibility . . . and [she] needs to be evaluated for [it]."  (*Id*.)  Dr. Sharpe referred Ms. Sullivan to pain management specialist Adam Hedaya, M.D. at Integrative Pain care, LLC for RSD evaluation.  (*Id*.)

Ms. Sullivan presented to Dr. Hedaya on November 7, 2019 (Tr. 391), reporting left foot pain (Tr. 394).  Examination findings were unremarkable, including normal gait, station, and motor strength.  (Tr. 395.)  Dr. Hedaya diagnosed plantar fasciitis of the left foot and CRPS.  (Tr. 396.)  Dr. Hedaya administered a stellate ganglion nerve block (Tr. 396), prescribed low dose Gabapentin and orthotics, and provided topical ointment samples (Tr. 390).

At a November 12, 2019 appointment with Dr. Sharpe, Ms. Sullivan reported dissatisfaction with treatment received by Dr. Hedaya.  (Tr. 669, 671.)  Dr. Sharpe noted at that visit that Ms. Sullivan could be facing long-term disability given that she had "extensive and comprehensive conservative care as well as a surgical procedure," "continue[d] to have chronic pain," and her "bone scan [was] most consistent with [RSD]," which would "be a chronic condition."  (Tr. 671.)  He also advised her to seek disability, noting that she had "a chronic pain condition," making "even . . . sedentary and light duty difficult secondary to the level of unrelenting pain."  (*Id*.)  He noted he was not recommending work, stating her "left foot need[ed] to be the priority" to "hopefully preserve some quality of life for her."  (*Id*.)

On November 19, 2019, Ms. Sullivan presented to a new pain management specialist— Dean C. Pahr, D.O., at LakeHealth Pain Management.  (Tr. 469.)  She reported left foot pain. (*Id*.)  On examination, Dr. Pahr noted left lateral foot pain and some pain with deeper palpation on the lateral aspect of her foot, but with no allodynia or hypersensitivity, and intact sensation to light touch.  (Tr. 470.)  Dr. Pahr diagnosed CRPS (Tr. 470) and administered a left lumbar sympathetic block for left lower extremity RSD on December 13, 2019 (Tr. 422-33).

6

In early January 2020, Ms. Sullivan was treated in the emergency room for an incarcerated epigastric hernia. (Tr. 482.) She underwent laparoscopic repair of the hernia on January 3, 2020. (Tr. 546.) During her admission, she reported walking frequently with no sensation/perception or mobility limitations. (Tr. 504.)

Ms. Sullivan returned to Dr. Pahr for follow up on January 15, 2020, reporting that she did not have "much benefit" from the block. (Tr. 466-67.) She continued to report left foot pain and was wearing orthotics. (Tr. 467.) Examination of her left foot revealed no redness, warmth, swelling, allodynia, or hypersensitivity. (*Id*.) Dr. Pahr prescribed Voltaren Gel and recommended follow up in two months. (*Id*.)

On February 4, 2020, Ms. Sullivan presented to Sara Lyn Miniaci-Coxhead, M.D., at the Cleveland Clinic Orthopaedics Department for a consultation regarding her left foot pain. (Tr. 793-96.) Dr. Miniaci-Coxhead reviewed Ms. Sullivan's x-rays and MRI, noting no gross abnormalities on the x-rays but edema on the lateral border of her foot shown on the MRI. (Tr. 794.) Examination findings were generally unremarkable, including a normal gait. (Tr. 795-96.) Dr. Miniaci-Coxhead recommended over-the-counter orthotics and provided a metatarsal pad and order for physical therapy. (*Id*.)

Ms. Sullivan continued to treat with Dr. Sharpe for her left lower extremity pain in 2020. (Tr. 479-80, 664, 667-68.) During a February 10, 2020 visit, Ms. Sullivan reported that nerve blocks had not helped. (Tr. 667.) She was still taking Gabapentin for her nerve pain but continued to have a difficult time walking on the lateral side of her foot. (*Id*.) Her examination revealed: slightly antalgic gait; maximal pain with palpation to the mid to dorsal 5th metatarsal shaft; pain around the 5th metatarsal phalangeal joint; pain with plantar palpation in this region; pain and discomfort across the plantar metatarsal head region to the mid to lateral forefoot on the

left; and some coolness and mottling or violaceous discoloration; but no evidence of ischemia or peripheral arterial disease, and no ecchymosis or erythema.  (*Id*.)  Dr. Sharpe recommended an updated MRI and noted she was "released to sedentary or light duty work, may sit 8 hours with standard breaks, may stand or walk 10 min per hour, may lift up to 10 lbs infrequently, no climbing ladders or heights."  (Tr. 667-68.)  Ms. Sullivan's February 14, 2020 MRI showed degenerative changes within the sesamoids versus mild sesamolditis and intermetataral bursitis first interspace.  (Tr. 479-80.)  On February 17, 2020, Dr. Sharpe informed Ms. Sullivan that the MRI showed no abnormal findings and recommended an EMG and rheumatology referral.[1]  (Tr. 665.)  EMG studies conducted on March 10 and March 18, 2020, for bilateral lower pain and numbness were within normal limits.  (Tr. 713-14.)

During a June 24, 2020, appointment with Laurence Kennedy, M.D., at the Cleveland Clinic for hypothyroidism, Ms. Sullivan reported a number of foot fractures over the past couple of years.  (Tr. 783.)  Her strength, tendon reflexes, and sensation were normal on examination with no tenderness, limitation of movement, or swelling in the joints.  (Tr. 785.)  Dr. Kennedy noted that another physician had ordered a bone density scan.  (Tr. 786.)  Kristina L. Vaji, APRN, CNP, at the Cleveland Clinic advised Ms. Sullivan that her bone density scan showed osteopenia or thinning of the bone but no osteoporosis.  (Tr. 789-790.)  Ms. Sullivan recognized that the finding of no osteoporosis was good news, but she was still concerned about her foot and was seeking a referral to an orthopedic physician.  (*Id*.)  CNP Vaji recommended that Ms. Sullivan follow up with podiatry.  (Tr. 790.)

---

[1] X-rays of the right foot were also taken after Plaintiff tripped over her dog the day before.  (Tr. 664.)  The x-rays showed "[a]cute avulsion fracture of the base of the proximal flax of the great toe medially" and "[p]ostsurgical appearance of the tibiotalar joint." (Tr. 664.)

On July 7, 2020, Ms. Sullivan returned to Dr. Miniaci-Coxhead regarding her left foot pain.  (Tr. 779-80.)  She reported no improvement in her pain with physical therapy.  (Tr. 780.)  Her pain level was a 6/10 at best and 10/10 at worst.  (*Id*.)  Her pain was worse with walking and improved with rest.  (*Id*.)  Dr. Miniaci-Coxhead recommended an MRI.  (*Id*.)  Her left lower extremity examination revealed diffuse pain across the forefoot with palpation and light touch, but was otherwise normal, including normal gait and strength, normal range of motion in the ankle, and no instability, swelling, redness, or ecchymosis.  (Tr. 782.)  Ms. Sullivan's left foot MRI showed degenerative changes and a small Morton's neuroma.  (Tr. 804-08.)

During a virtual follow-up visit with Dr. Miniaci-Coxhead on July 27, 2020, a left foot and ankle examination was performed with instructions via video; pain was localized to the lateral and midfoot; gait was normal; sensation was intact; and there was full range of motion of all aspects of ankle extension, flexion, eversion, and inversion.  (Tr. 778.)  Dr. Miniaci-Coxhead noted that the etiology of Ms. Sullivan's foot pain was unclear based on the MRI and described the neuroma as an "incidental finding" given that Ms. Sullivan's pain was not at the location of the neuroma.  (*Id*.)  Dr. Miniaci-Coxhead recommended physical therapy and custom orthotics, felt that Ms. Sullivan's pain could be related to overloading of the lateral border of her foot following her knee replacement, and hoped it would improve with orthotics.  (*Id*.)

At a psychological consultative examination on July 28, 2020, Ms. Sullivan's gait and posture and gait were unremarkable, and her motoric activity appeared to be within average limits.  (Tr. 723, 726.)  Ms. Sullivan reported being able to care for her hygiene daily, change her clothes daily, wash or shampoo her hair daily, vacuum and sweep the floors daily, mop the floors twice a week, do laundry daily, shop in stores once a week, cook dinner daily, use the computer (including the internet, Google, and Facebook) daily, do yard work, take care of a seven-year

old, and babysit her grandchildren (ages 4 and 5) once a week for an hour and sometimes overnight. (Tr. 728.)

On July 30, 2020, Ms. Sullivan presented to Matthew Testrake, DPM, for a podiatric evaluation of her chronic left foot pain. (Tr. 772-73.) Examination findings included pain to palpation of the ball of the left foot and lateral aspect of the left 5th metatarsal and mild pain to left plantar 2nd interspace. (Tr. 775.) No pain was noted in the left midfoot and heel. (*Id*.) Muscle strength was normal with dorsiflexion, plantar flexion, inversion, and eversion bilaterally. (Tr. 775-76.) Dr. Testrake diagnosed left foot pain and neuroma and recommended custom orthotics. (Tr. 776.) Ms. Sullivan was not interested in physical therapy because she felt it had not helped in the past. (*Id*.) She also declined an injection of the left 2nd interspace for possible neuroma. (*Id*.)

During a routine physical examination with CNP Vaji on October 2, 2020, Ms. Sullivan complained that she had not been able to lift her left arm up for the past three weeks. (Tr. 768.) Her examination noted left shoulder pain at 90 degrees and a positive Phelan's test; findings were otherwise unremarkable. (Tr. 770.) Her gait, reflexes, and pulses were normal with no edema. (*Id*.) At a January 12, 2021 follow-up visit with CNP Vaji regarding her left shoulder, Ms. Sullivan reported no relief from physical therapy. (Tr. 932.) Her examination noted pain with abduction at 45 degrees and positive Phalen's test on the left, but no edema and good distal pulses in the lower extremities. (Tr. 933.) CNP Vaji recommended an orthopedics consult regarding the left shoulder. (*Id*.)

On April 19, 2021, Ms. Sullivan underwent a distance health pre-anesthesia examination with Suzanne Lee, PA, at the Cleveland Clinic in preparation for a scheduled excision cyst / mass neck subcutaneous. (Tr. 2711.) Examination revealed: no edema, swelling, clubbing, or

10

tenderness in the extremities; normal gait; no weakness or sensory deficit; and normal motor skills. (Tr. 2713.)

Ms. Sullivan attended pain management appointments at the Cleveland Clinic in August 2021 (Tr. 1416-20) and November 2021 (Tr. 1411-12) for shoulder, knee, and foot pain. She reported that her pain interfered with daily activities, including standing, walking, and sleeping. (Tr. 1419.) Examinations during the visits revealed left-handed grip weakness (Tr. 1419) and limited mobility in Ms. Sullivan's shoulders (Tr. 1412) but normal extremities (Tr. 1419) with no edema in the lower extremities bilaterally (Tr. 1412, 1419).

On February 24, 2022, Ms. Sullivan presented for an internal medicine appointment at the Cleveland Clinic with Jennifer Wilson, APRN, CNP, for follow up regarding her blood pressure. (Tr. 2385.) Examination findings were unremarkable, with no edema and good distal pulses noted in the lower extremities. (Tr. 2386.) Recommendations included dietary modifications and regular aerobic exercise. (*Id.*) At follow up appointments in May and August 2022 relating to Ms. Sullivan's blood pressure, examination findings remained unremarkable, with no edema in the lower extremities. (Tr. 1381, 2291.) In August 2022, CNP Wilson continued to recommend regular aerobic exercise. (Tr. 1381.)

On March 9, 2023, Ms. Sullivan presented to CNP Wilson for complaints of bilateral leg swelling, left greater than right. (Tr. 1362.) Ms. Sullivan's examination revealed: mild non-pitting edema in the bilateral ankles, left greater than right; no joint swelling, deformity, or tenderness; normal peripheral pulses; normal gait and reflexes; and grossly intact sensation. (Tr. 1365.) CNP Wilson recommended that Ms. Sullivan wear compression stockings, elevate her legs at rest, and increase her fluid intake to address her bilateral leg edema. (*Id.*)

On March 13, 2023, Ms. Sullivan messaged CNP Wilson to let her know that her leg swelling remained about the same despite wearing compression stockings during the day.  (Tr. 2076.)  She also informed CNP Wilson that her left foot was going numb if she sat too long. (*Id*.)  CNP Wilson adjusted Ms. Sullivan's medication and advised her to follow up in two weeks or sooner if her symptoms worsened.  (*Id*.)

On July 17, 2023, Ms. Sullivan presented to Angela Brinkman, D.O., at the Cleveland Clinic for a recheck after falling and hitting the back of her head about ten days earlier.[2]  (Tr. 1330.)  She reported tenderness but no loss of consciousness, and she initially had a headache. (*Id*.)  The tenderness in her head had resolved but she also reported left rib pain since March 2023.  (*Id*.)  She denied injury to her ribs but said she took care of three grandchildren and lifted them frequently.  (*Id*.)  Examination revealed tenderness over the left side of her ribs and minimal tenderness over the scalp.  (Tr. 1331.)  There was no cyanosis, clubbing or edema in the lower extremities.  (*Id*.)

On July 19, 2023, Ms. Sullivan presented to Keith Kruithoff, M.D., at the Cleveland Clinic for a cardiac consultation relating to complaints of shortness of breath on exertion and chest heaviness that was worsened by walking.  (Tr. 1735-36.)  Her examination noted no edema in the lower extremities and she was able to move all four extremities.  (Tr. 1739.)

During a visit with Raymond Salomone, M.D., at the Cleveland Clinic in August 2023 for follow up regarding asthma and COPD (Tr. 1298), examination findings included no edema in the feet/ankles and full and symmetrical posterior tibial pulses in her extremities (Tr. 1300).

During cardiopulmonary rehab sessions in January and February 2024 (Tr. 2918-26), Ms. Sullivan reported chronic discomfort with foot pain rated 4/10 at her first appointment on

---

[2] Treatment records also reflect a fall in May 2023.  (Tr. 1340.)

January 25, 2024 (Tr. 2918).  The sessions lasted 40 minutes to one hour, and it was noted that

Ms. Sullivan appeared to tolerate exercise well at all sessions with no complaints.  (Tr. 2918-26.)

## 2.     Relevant Opinion Evidence

### i.     Treating Source

On March 11, 2021, Dr. Sharpe completed two medical opinions.  He completed a

Medical Source Statement Regarding Leg/Foot Impairment(s) (Tr. 970-71) and an Off-Task /

Absenteeism Questionnaire (Tr. 972).[3]

In the Medical Source Statement, he stated Ms. Sullivan had a history of chronic left foot

pain, noting the following diagnoses: complex regional pain syndrome I, unspecified (G90.50);

pain in left foot (M79.672); primary osteoarthritis, left ankle and foot (M19.072); and plantar

fascial fibromatosis (M72.2).  (Tr. 970.)  Dr. Sharpe opined that Ms. Sullivan could stand for 5 to

15 minutes at one time and stand/walk for about 2 hours total in an 8-hour working day and

could sit for at least 6 hours in an 8-hour working day.  (*Id.*)  He further opined she would not

need to elevate her leg(s) to waist level or higher during an 8-hour workday, but could not: walk

a block at a reasonable pace on rough or uneven surfaces; walk enough to shop or bank; climb a

few steps at a reasonable pace with the use of a single handrail.  (*Id.*)  He also opined she

suffered from "marked" pain, with "marked" described as a "serious limitation" that "severely

limit[ed] ability to function."  (Tr. 971.)  He opined that the limitations had existed since August

6, 2018, explaining that Ms. Sullivan's chronic left foot pain was "unresponsive to conservative

and surgical care" and was "likely secondary to RSD – a chronic nerve pain condition."  (*Id.*)

---

[3] The record contains two additional opinions from Dr. Sharpe dated November 2019 and February 2020.  (Tr. 667-68, 671, 1003-04.)  Because Plaintiff does not challenge the ALJ's analysis of those opinions, they are not summarized herein.

In the Off-Task / Absenteeism Questionnaire, Dr. Sharpe opined that Ms. Sullivan's left foot pain would likely cause her to be off-task at least 20% of the time, exclusive of a 30-minute lunch break and two 15-minute breaks.  (Tr. 972.)  He also opined that Ms. Sullivan would be absent from work about four times per month due to her impairments and treatment, and that the severity of her limitations had existed since at least August 6, 2018.  (*Id*.)

### ii.     State Agency Medical Consultants

On April 20, 2020, state agency medical consultant Abraham Mikalov, M.D., completed a physical RFC assessment.  (Tr. 80-81, 83-85.)  Dr. Mikalov found Ms. Sullivan had the following medically determinable physical impairments: fractures of lower limb; osteoarthritis and allied disorders; thyroid disorders; and hernias.  (Tr. 81.)  He opined that that Ms. Sullivan had the RFC to: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of six hours in an eight-hour workday; sit about six hours in an eight-hour workday; frequently push/pull with the left lower extremity; never climb ladders, ropes, or scaffolds; occasionally kneel, crouch, and crawl; frequently balance, stoop, and climb ramps or stairs; and should avoid concentrated exposure to unprotected heights and heavy machinery.  (Tr. 83-85.)  On November 7, 2020, state agency medical consultant W. Scott Bolz, M.D., completed a physical RFC assessment upon reconsideration and affirmed Dr. Mikalov's findings.  (Tr. 107-08, 110-11.)

### C.     Hearing Testimony

### 1.     Plaintiff's Testimony

Ms. Sullivan testified at the March 31, 2021, and January 30, 2024, hearings in response to questioning by the ALJ and her attorney.  (Tr. 44-69, 70-71, 1019-45.)  At the 2021 hearing, she testified that she has not worked since September of 2019.  (Tr. 58.)  She stated that she

could not work because she could only sit for about 10 or 15 minutes before needing to stand up because her knees locked up.  (*Id*.)  She also could not stand very long either because she had severe arthritis in her knee and foot which made it hard to stand and caused her knees to give out. (*Id*.)  She reported trying injections, physical therapy and surgery for plantar fasciitis.  (Tr. 58-59.)  She felt physical therapy caused her pain to worsen.  (Tr. 59.)  With her foot surgery, her doctor relieved the tendon, but it did not heal and she was in a walking cast.  (*Id*.)  She was still using orthotics and had started with a new doctor for treatment relating to her foot, knees, and shoulders.  (Tr. 59-60.)

At the 2024 hearing, Ms. Sullivan reported living with her adult daughter, 11-year-old daughter, and 11-year-old great niece.  (Tr. 1019-23.)  She had not worked since her last hearing. (Tr. 1020-21, 1023.)  She testified that her breathing issues and foot, knee, and shoulder pain impacted her ability to work.  (Tr. 1029-31.)  She could shower and dress herself but with some difficulty due to not being able to bend over.  (Tr. 1032.)  She could cook, do laundry, load the dishwasher, use a Swiffer on the floors, make her own bed, clean her bathroom (except for the bathtub), prepare the children's lunches, drive, take the children to and from practices, and attend the younger girls' sporting events with her older daughter.  (Tr. 1032-36.)  She could clean the house, but it took her all day because she had to take breaks.  (Tr. 1032, 1040.)   She said she did not travel alone and did not do yardwork.  (Tr. 1034.)

Ms. Sullivan reported that her orthopedic inserts "helped some," but she still could not stand for more than 10 minutes before needing to sit due to foot pain.  (Tr. 1029-30.)  In addition to knee pain, she could not bend her knees and her range of motion was restricted due to bilateral knee replacements.  (Tr. 1031, 1038-39.)  Cold weather made her knee pain worse.  (Tr. 1039.) She wore compression stockings and elevated her feet between four and eight times per day to

address swelling in her legs.  (Tr. 1030, 1040.)  Her pain was constant and did not improve with medication, injections, or therapy.  (Tr. 1039-40.)  She estimated that her left foot pain fluctuated between a four and an eight on a scale of 1 to 10; the pain was constant and did not improve with medication, injections, or physical therapy.  (Tr. 1039-40.)  When asked how much weight she could comfortably lift, she said she was unable to hold her 9-pound grandson while standing; she had to hold him while sitting down.  (Tr. 1037-38.)

2.    **Vocational Expert's Testimony**

Vocational experts ("VEs") testified at the two hearings.  (Tr. 69-70, 71-76, 1023-29, 1045-53.)  At the second hearing, the VE confirmed the following classifications for Ms. Sullivan's past work: warehouse worker (medium, SVP 2, performed by Plaintiff at a medium to heavy level); retail store manager (light, SVP 7); and garment folder (light, SVP 2). (Tr. 1024-29, 1045-50.)  She testified that an individual with the functional limitations described in the ALJ's light RFC determination (Tr. 1000, 1051), could perform Ms. Sullivan's past work as a garment folder and retail manager, as performed and as generally performed (Tr. 1051).  She testified that the warehouse worker job would be eliminated, both as performed and as generally performed.  (*Id*.)  She also testified that all of Ms. Sullivan's past work would be eliminated if the hypothetical individual was reduced from light to sedentary work.  (Tr. 1052.)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.    If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § § 404.1520; 416.920[4]; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

---

[4] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work in the national economy. *Id.*

## IV. The ALJ's Decision

In her April 16, 2024 decision, the ALJ found at Step One that Ms. Sullivan had not engaged in substantial gainful activity since September 8, 2019. (Tr. 996.) At Step Two, the ALJ found Ms. Sullivan had severe impairments of: fractures of the left foot; osteoarthritis of the left foot and bilateral knees; hypothyroidism; hernia; and complex regional pain syndrome. (*Id.*) The ALJ found other impairments, including anxiety disorder and left shoulder pain, rotator cuff tendinosis, and osteoarthritis, were not severe impairments. (Tr. 996-99.) At Step Three, the ALJ found Ms. Sullivan's impairments did not meet or medically equal the requirements of a listed impairment. (Tr. 999.) At Step Four, the ALJ determined Ms. Sullivan had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) except she can: frequently push and pull with the left lower extremity; frequently climb ramps and stairs, balance, and stoop; occasionally kneel, crouch, and crawl; never climb ladders, ropes, or scaffolds; and tolerate frequent exposure to hazards such as unprotected heights and dangerous moving machinery. (Tr. 1000-04.) The ALJ then found that Ms. Sullivan could perform her past relevant work as garment folder and retail store manager and concluded she had not been under a disability from September 8, 2019, through the date of the decision. (Tr. 1004-05.)

## V. Plaintiff's Arguments

Plaintiff presents two assignments of error. First, she argues the ALJ's analysis of the state agency medical consultants' opinions is not supported by substantial evidence. (ECF Doc. 9, pp. 1, 16-21; ECF Doc. 13, pp. 1-3.) Second, she argues the ALJ's analysis of Dr. Sharpe's

March 11, 2021 medical opinions is not supported by substantial evidence. (ECF Doc. 9, pp. 1, 22-24; ECF Doc. 13, pp. 3-4.)

## VI.    Law & Analysis

### A.    Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive[.]" *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if

substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004))).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.      Plaintiff's Assignments of Error**

In both assignments of error, Ms. Sullivan asserts the ALJ's analysis of medical opinion evidence lacks the support of substantial evidence.  (ECF Doc. 9, pp. 1, 16-25; ECF Doc. 13.) Accordingly, before turning to each assignment of error, the Court outlines the Social Security Administration's ("SSA") regulations for evaluating medical opinion evidence.

Under the SSA's regulations for evaluating medical opinion evidence, ALJs do "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." 20 C.F.R. § 404.1520c(a); *see Sallaz v. Comm'r of Soc. Sec.*, No. 23-3825, 2024 WL 2955645, at *5 (6th Cir. June 12, 2024) (quoting 20 C.F.R. § 404.1520c(a)).  They are required to evaluate the "persuasiveness" of medical opinions "using the factors listed in paragraphs (c)(1) through

20

(c)(5)" of the regulation.  20 C.F.R. § 404.1520c.  Those five factors include supportability, consistency, relationship with the claimant, specialization, and other factors; but the most important factors are supportability and consistency.  20 C.F.R. §§ 404.1520c(a), 404.1520c(b)(2), 404.1520c(c)(1)-(5).  ALJs must explain how they considered consistency and supportability but need not explain how they considered other factors.  20 C.F.R. § 404.1520c(b)(2).

As to supportability, the regulations state: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(1).  In other words, "supportability" is the extent to which a medical source's own objective findings and supporting explanations substantiate or support the findings in the opinion.

As to consistency, the regulations state: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(2).  In other words, "consistency" is the extent to which a medical source's opinion findings are consistent with the evidence from other medical and nonmedical sources in the record.

In reviewing an ALJ's medical opinion analysis, courts must consider whether the ALJ: considered the full record in assessing the persuasiveness of the opinion; appropriately articulated his reasons for finding the opinion unpersuasive; and made findings supported by substantial evidence.  *See* 20 C.F.R. § 404.1520c (governing how ALJs consider and articulate

findings re: medical opinions); 20 C.F.R. § 404.1520(e) (findings re: RFCs will be "based on all the relevant medical and other evidence" in the case record); *see also Blakley*, 581 F.3d at 405.

1.    **First Assignment of Error: Substantial Evidence Supports the ALJ's Analysis of the State Agency Medical Consultants' Opinions**

In her first assignment of error, Ms. Sullivan challenges the ALJ's analysis of the state agency medical consultants' opinions.  (ECF Doc. 9, pp. 1, 16-21; ECF Doc. 13, pp. 1-3.)  She argues that substantial evidence does not support the ALJ's finding that the state agency opinions are persuasive because the ALJ's discussion of supportability and consistency is flawed.  (*Id.*)  In response, the Commissioner argues the ALJ properly considered supportability and consistency when assessing the persuasiveness of the state agency medical opinions, and that her findings were supported by substantial evidence.  (ECF Doc. 12, pp. 6-9.)

The ALJ evaluated the state agency medical consultants' opinions as follows:

The State agency medical consultants, Abraham Mikalov, M.D., and W. Scott Bolz, M.D., opined that the claimant could perform light work, frequently push and pull with the left lower extremity, frequently balance, stoop, and climb ramps and stairs, occasionally kneel, crouch, and crawl, but never climb ladders, ropes, or scaffolds, and should avoid concentrated exposure to unprotected heights and heavy machinery (2A; 4A; 6A; 8A; 10A; 12A). <u>These opinions are persuasive, as they are well-supported by the findings documented in their opinions, which included the claimant's allegations, reported activities of daily living, osteoarthritis of the left knee, osteoarthritis and fracture of the great toe, slight antalgic gait, maximum pain with palpation, abnormal imaging, laparoscopic repair of hernia, normal gait, no swelling, intact sensation, and normal EMG. Further, their opinions are consistent with more recent evidence showing unremarkable physical exams where the claimant moved all extremities, had stable hypothyroidism, exhibited normal gait, and appeared to tolerate exercise well</u> (17F/17, 90; 18F/89, 1063; 20F/2, 10).

(Tr. 1003 (emphasis added).)

For the reasons explained below, the Court finds the ALJ appropriately considered the consistency and supportability of the medical consultants' opinions and adequately explained how she considered those factors.  *See* 20 C.F.R. §§ 404.1520c(a); 404.1520c(b)(2).

i.       **The ALJ Adequately Addressed Supportability**

As to supportability—the extent to which a medical source's own objective findings and supporting explanations substantiate or support the findings in the opinion—the ALJ found that the state agency opinions were "well-supported by findings documented in [those] opinions," including Ms. Sullivan's subjective reports, daily activities, and specified diagnoses, examination findings, and clinical testing results.  (Tr. 1003.)  Ms. Sullivan challenges the adequacy of this explanation, arguing that the state agency consultants "failed to recognize CRPS as a medically determinable impairment during their review(s) of Plaintiff's record" and "did not address the three-phase bone scans that were the laboratory findings which established the presence of CRPS."  (ECF Doc. 9, p. 19.)  Because these matters were not explicitly addressed in the state agency opinions, Ms. Sullivan argues "the ALJ's discussion of supportability glossed over the fact that the consultants overlooked CRPS altogether[.]"  (*Id*.)  Thus, she argues the ALJ erred by relying on the state agency opinions because the "opinions did not accurately reflect Plaintiff's remaining abilities in the absence of any discussion of CRPS."  (*Id*. at pp. 19-20.)

Ms. Sullivan's argument relies on two assumptions that are not supported by the record. First, she assumes the state agency medical consultants did not factor CRPS into their opinions because they did not designate CRPS a medically determinable impairment or discuss the bone scans relied on by Dr. Sharpe in diagnosing CRPS.  (*Id.*)  But a review of the administrative record suggests that the consultants did review the medical records relating to Ms. Sullivan's diagnosis and treatment for CRPS before reaching their medical opinions.  (*See* Tr. 80-81 (noting Dr. Pahr's November 19, 2019 CRPS diagnosis and December 13, 2019 lumbar sympathetic block administered by Dr. Pahr), Tr. 82-85 (Mikalov opinion), Tr. 11 (Bolz opinion: "review of the [medical evidence of record] does not support material change from the initial RFC").)

Second, Ms. Sullivan appears to suggest that it was improper for the ALJ to rely on the state agency consultants' opinions without specifically discussing "the fact that the consultants overlooked CRPS altogether."  (ECF Doc. 9, p. 19.)  But the Sixth Circuit has held that an ALJ may rely on state agency opinions that do not account for all relevant medical evidence, so long as the ALJ herself takes that relevant evidence into account.  *See, e.g., McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009) (rejecting argument that "ALJ improperly relied on the state agency physicians' opinions because they were out of date and did not account for changes in her medical condition," finding it sufficient that the ALJ considered later medical records and "took into account any relevant changes in [the claimant]'s condition"); *see also Blakley*, 581 F.3d at 409 (finding there must be "some indication that the ALJ at least considered" medical evidence that post-dates a non-examining source opinion) (quoting *Fisk v. Astrue*, 253 F. App'x 580, 585 (6th Cir. 2007)).

Here, the ALJ found CRPS to be a severe medically determinable impairment (Tr. 996), acknowledged Ms. Sullivan's complaints of foot pain and reported activities of daily living (Tr. 1000), and detailed the medical records relevant to Ms. Sullivan's CRPS diagnosis and related treatment (Tr. 1001-02) before finding the state agency opinion findings persuasive (Tr. 1003). Thus, even if it were not apparent that the state agency consultants considered that CRPS diagnosis and related treatment in reaching their own opinion findings, the ALJ was not required to rearticulate her earlier consideration of Ms. Sullivan's CRPS for her findings to be supported by substantial evidence.  *See Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016) (noting the ALJ did not reproduce a list of treatment records a second time in support of an opinion analysis, but finding "it suffices that she listed them elsewhere in her opinion"); *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006) ("[T]here is no heightened articulation

24

standard where the ALJ's findings are supported by substantial evidence.").  The Court therefore finds Ms. Sullivan has not met her burden to show that the ALJ failed to adequately address supportability or made supportability findings that lacked the support of substantial evidence.

### ii.    The ALJ Adequately Addressed Consistency

As to consistency—the extent to which a medical source's opinion findings are consistent with the evidence from other medical and nonmedical sources in the record—the ALJ considered this factor, concluding that the state agency opinions were "consistent with more recent evidence showing unremarkable physical exams where the claimant moved all extremities, had stable hypothyroidism, exhibited normal gait, and appeared to tolerate exercise well." (Tr. 1003.)  Ms. Sullivan challenges this finding, asserting that the cited records relate to "medical visits for issues that are unrelated to [her] severe medically determinable impairments."  (ECF Doc. 9, p. 20.)  Indeed, she goes so far as to assert that the ALJ "scoured the record for normal exam findings from minor, routine medical appointments that were irrelevant to her application for benefits" and argues that "'cherry-picking' the record in this manner rose to the level of an impermissible mischaracterization of the record."  (*Id*. at p. 21.)

Ms. Sullivan's arguments must fail for several reasons.  First, while she asserts that the ALJ improperly "scoured the record" looking for normal examination findings in "irrelevant" medical appointments (*Id*.), Ms. Sullivan does not identify treatment records from "relevant" medical appointments that contain abnormal examination findings the ALJ allegedly failed to consider in her analysis.  As discussed above, an ALJ may rely on her previous discussion of medical records to support her opinion analysis, and need "not reproduce the list of . . . treatment records a second time."  *Crum*, 660 F. App'x at 457 (citing *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014)).  Here, the ALJ's summary of the medical records reveals

numerous instances where Ms. Sullivan's examination findings from "relevant" treatment visits were largely unremarkable, including:

- Examination findings from pain management visits in 2019, which revealed left foot pain, but also revealed no allodynia or hypersensitivity and also showed normal gait, motor strength, muscle tone, and intact sensation.  (Tr. 1001 (citing Tr. 389, 470));

- Examination findings from an orthopedic visit for her foot pain in 2020, showing left foot pain but full strength and normal range of motion in the foot and ankle and normal gait (Tr. 1002 (citing Tr. 782)); and

- Examination findings from a podiatry appointment in 2020, showing pain in the left foot but full muscle strength (*id.* (citing Tr. 775-76)).

Second, it was not improper for the ALJ cite or rely on clinical examination findings from treatment visits that did not relate specifically to Ms. Sullivan's left foot impairment.  The ALJ is required to consider "all evidence in [a claimant's] case record" when making a disability determination.  *See* 20 C.F.R. § 404.1520(a)(3).  The fact that Ms. Sullivan was observed by medical providers to move all of her extremities, walk with a normal gait, tolerate 40 minutes or more of exercise well, and/or did not exhibit lower extremity swelling, is relevant to the ALJ's assessment of Ms. Sullivan's subjective complaints of left foot pain and difficulty standing or walking, regardless of the underlying purpose of the relevant treatment visits.  Ms. Sullivan's argument that the ALJ "consider[ed] *none* of the relevant evidence in the record when assessing the opinion evidence" (ECF Doc. 13, p. 3 (emphasis in original)) is not supported by the record.  The Court finds Ms. Sullivan has not met her burden to show that the ALJ failed to adequately address consistency or made consistency findings that lacked the support of substantial evidence.

For the reasons set forth above, the Court finds Ms. Sullivan has not shown that the ALJ failed to consider supportability or consistency when assessing the persuasiveness of the state agency medical consultants' opinions, nor has she shown that the ALJ's findings lacked the

support of substantial evidence.  Accordingly, the Court finds Ms. Sullivan's first assignment of error is without merit.

>    2.    **Second Assignment of Error: The ALJ Did Not Adequately Explain Her Findings Regarding the "Supportability" of Dr. Sharpe's Medical Opinion**

In her second assignment of error, Ms. Sullivan challenges the ALJ's analysis of the March 11, 2021 opinions authored by her treating podiatrist Dr. Sharpe.  (ECF Doc. 9, pp. 1, 22-24; ECF Doc. 13, pp. 3-4.)  Specifically, she argues that the ALJ's rationale for finding the March 11, 2021 opinions "not persuasive" lacks the support of substantial evidence because the ALJ did not appropriately consider supportability and consistency.  (*Id.*)  In response, the Commissioner argues that the ALJ properly considered supportability and consistency when assessing the persuasiveness of Dr. Sharpe's opinions, and that her findings were supported by substantial evidence.  (ECF Doc. 12, pp. 9-12.)

>    The ALJ evaluated Dr. Sharpe's March 11, 2021 opinion as follows:
>
>    In March 2021, Jonathan Sharpe, DPM, opined that the claimant could stand and/or walk for 2 hours, sit for 6 hours, had pain that caused marked limitation, and would likely be off task at least 20% of the time, and would be absent about 4 times per month, but did not need to elevate her legs (16F). <u>This opinion is not persuasive, as the degree of limitation described is not well supported by the findings documented in their exam, which included chronic left foot pain that was unresponsive to conservative and surgical care, along with chronic pain. Further, this opinion is not consistent with the opinions of the State agency medical consultants, or with more recent evidence showing unremarkable physical exams where the claimant moved all extremities, recently endorsed only 4 out of 10 foot pain, exhibited normal gait, and appeared to tolerate exercise well</u> (2A; 4A; 6A; 8A; 10A; 12A; 17F/17, 90; 18F/89, 1063; 20F/2, 10).

(Tr. 1004 (emphasis added).)  For the reasons explained below, the Court concludes that the ALJ failed to adequately explain her consideration of the supportability factor as required under the regulations.[5]  *See* 20 C.F.R. §§ 404.1520c(a); 404.1520c(b)(2).

---

[5] Because the ALJ's decision is remanded based on a failure to adequately address the supportability of Dr. Sharpe's opinion, the Court need not address the ALJ findings as to the "consistency" of the opinion.  Nevertheless, the Court

As to supportability—the extent to which a medical source's own objective findings and supporting explanations substantiate or support the findings in the opinion—the ALJ concluded that Dr. Sharpe's opinion was not persuasive "as the degree of limitation described is not well supported by the findings documented in their exam, which included chronic left foot pain that was unresponsive to conservative and surgical care, along with chronic pain." (Tr. 1004.)  Ms. Sullivan argues that this rationale lacks the support of substantial evidence because: "It is unclear why a chronic condition accompanied by unrelenting foot pain that is impervious to both conservative and surgical care is an inadequate basis for a medical opinion that a patient should not work on their feet and may have trouble staying on task." (ECF Doc. 9, p. 23.)  She also asserts that the ALJ's supportability "finding does not enjoy the support of substantial evidence because each of the bases provided by Dr. Sharpe find support in the underlying record[.]" (*Id.*) In response, the Commissioner argues that, "as noted by the ALJ, the only explanation Dr. Sharpe provided on the form was that Plaintiff's pain was unresponsive to conservative and surgical care and was 'secondary to RSD – a chronic nerve pain condition,'" making Dr. Sharpe's opinion patently deficient because it involves a check-box analysis and "d[oes] not include objective examination findings to support his opinion." (ECF Doc. 12, p. 10.)

The Commissioner thus relies on two arguments.  First, he argues that the ALJ found Dr. Sharpe's opinion lacked support because Dr. Sharpe failed to provide an adequate explanation for his opinion findings, with the identified findings being "the only explanation Dr. Sharpe provided on the form." (*Id.*)  And second, he argues that the opinion is "inherently deficient,"

_____

observes that Plaintiff's challenge to the ALJ's consistency finding as to Dr. Sharpe is based on similar arguments to those raised in connection with the ALJ's evaluation of the state agency medical consultants' opinions.  (ECF Doc. 9, pp. 23-24.)  For the same reasons set forth in Section VI.B.1., *supra*, the Court finds the ALJ's consistency finding regarding Dr. Sharpe's opinion is adequately explained and supported by substantial evidence.

regardless of the ALJ's stated findings, because it was contained in a checkbox form and not supported by objective findings.  (*Id.*)  Neither argument is persuasive here.

As to the first argument, contrary to the Commissioner's assertions, the language used by the ALJ in discussing supportability does not clearly reflect a finding that Dr. Sharpe's opinion lacked adequate explanation.  What the ALJ found was that the "degree of limitation described" in the opinion was "not well supported by the findings described in [Dr. Sharpe's] exam."  (Tr. 1004.)  In so finding, however, the ALJ did not identify physical examination findings that were clearly or apparently at odds with the stated degree of limitation; instead, she said the relevant examination findings "included chronic left foot pain that was unresponsive to conservative or surgical care, along with chronic pain."  (*Id.*)  Notably, the Court observes that Dr. Sharpe's treatment notes also document similar findings.  (*See e.g.*, Tr. 667, 671, 675, 677, 683, 687, 689, 692, 696, 698, 701, 703-04.)  In this context, the Court agrees with Ms. Sullivan that it is unclear why findings of chronic foot pain that is unresponsive to conservative or surgical care would not support an opinion limiting Ms. Sullivan's ability to stand, walk, and remain on task.[6]

An ALJ is required to "explain how" she "considered the supportability . . . factor," *see* 20 C.F.R. § 404.1520c(b)(2), and the ALJ's explanation must "build an accurate and logical bridge between the evidence and the result."  *Fleischer*, 774 F. Supp. 2d at 877.  It is not this Court's role "to scour the record for evidence . . . which the ALJ *might* have relied on and which *could* support a finding of no-disability *if* the ALJ actually considered it."  *Karger v. Comm'r of Soc. Sec.*, 414 F. App'x 739, 754 (6th Cir. 2011) (emphasis in original).  Based on its review of the ALJ's written decision, the Court concludes that the ALJ's findings regarding the

---

[6] Indeed, the ALJ found with respect to another of Dr. Sharpe's medical opinions that the opinion was "supported by the findings documented in their exam, which included no changes or improvement in her left foot, and continued chronic pain and symptoms."  (Tr. 1003.)

supportability of Dr. Sharpe's March 2021 medical opinion lack sufficient explanation for the Court to meaningfully assess whether the findings are supported by substantial evidence, and that the ALJ has accordingly failed to build a logical bridge between the evidence and the result.

The Commissioner's second argument—that Dr. Sharpe's opinion is "inherently deficient" regardless of the ALJ's stated findings because it is written on a check-box form and does not list objective findings in support—does not alter the Court's analysis.  It is well established that "'[a]n agency's actions must be upheld, if at all, on the basis articulated by the agency itself,' . . . and not based on 'appellate counsel's post hoc rationalization[s].'"  *Hicks v. Comm'r of Soc. Sec.*, 909 F.3d 786, 808 (6th Cir. 2018) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) and *Comcast Cablevision-Taylor v. N.L.R.B.*, 232 F.3d 490, 497 (6th Cir. 2000)); *see also Foltz obo R.B.K.F. v. Comm'r of Soc. Sec.*, No. 23-3362, 2023 WL 7391701, at *4 (6th Cir. Nov. 8, 2023) ("Agency actions 'must be upheld ... on the basis articulated by the agency itself.'") (internal citation omitted); *Keeton v. Comm'r of Soc. Sec.*, 583 F. App'x 515, 524 (6th Cir. 2014) ("In reviewing an ALJ's findings and conclusions, this Court shall not 'accept appellate counsel's *post hoc* rationalization for agency action in lieu of [accurate] reasons and findings enunciated by the Board.'") (quoting *Hyatt Corp. v. N.L.R.B.*, 939 F.2d 361, 367 (6th Cir.1991)) (brackets and italics in original).

Because the ALJ in this case did not explicitly base her supportability findings on Dr. Sharpe's use of a check-box form or his failure to cite to objective findings, this Court may not consider such post hoc reasoning in assessing the ALJ's findings.  For the reasons stated above, the Court concludes that the ALJ's supportability findings lacked the support of substantial evidence and fail to build a logical bridge between the evidence and the result.  Further, the Court finds that the relevant error is not harmless because the standing and walking limitations

set forth in Dr. Sharpe's opinion would limit Ms. Sullivan to sedentary work, which the VE testified would preclude her from performing her past relevant work.  (Tr. 1052-53.)

For the reasons set forth above, the Court concludes that the ALJ committed reversible error and failed to build a logical bridge between the evidence and the result when she failed to clearly articulate her grounds for finding that Dr. Sharpe's medical opinion was "not well-supported" by specified findings in his opinion.  Accordingly, the Court finds Ms. Sullivan's second assignment of error is well-taken and remands the decision for further proceedings consistent with this opinion and order.

## VII.    Conclusion

For the foregoing reasons, the Court **VACATES** and **REMANDS** the case pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this Order.  On remand, the ALJ should provide a clear, accurate, and well-reasoned explanation to support her findings regarding the persuasiveness of all medical opinion evidence, including the medical opinions of treating provider Jonathan Sharpe, DPM, and ensure that her stated rationale builds an accurate and logical bridge between the evidence and the result.

February 24, 2026

/s/Amanda M. Knapp
AMANDA M. KNAPP
United States Magistrate Judge